**Florence L. BARBETTA, and James D. Barbetta, Plaintiffs–Appellants,**

v.

**S/S BERMUDA STAR, in rem, her engines, tackle, and machinery, Etc., et al., Defendants–Appellees.**

No. 87–3478.

United States Court of Appeals,
Fifth Circuit.

June 29, 1988.

Timothy W. Crooks, Maria I. O'Byrne Stephenson, New Orleans, La., for plaintiffs-appellants.

Thomas J. Wagner, R. Christopher Martin, Wagner & Bagot, New Orleans, La., for defendants-appellees.

Before TIMBERS \*, KING and HIGGINBOTHAM, Circuit Judges.

KING, Circuit Judge:

Plaintiffs, a married couple who booked a cruise to Mexico in 1986, sued the ship on which they sailed because the ship's doctor, when treating the wife during the cruise, failed to discover that the wife had diabetes. Defendant moved for summary judgment and, after a hearing and time for discovery, the district court granted defendant's motion. According to the district court, to the extent plaintiffs were attempting to impose respondeat superior liability upon defendant, their claim had to fail; as a matter of law, the negligence of the ship's doctor could not be imputed to the ship that hired him. And while the ship could be liable, the court conceded, if it negligently hired an incompetent doctor, the evidence in the record did not raise a fact question on that issue. Having now appealed the district court's decision, plaintiffs ask us to reject both reasons which led that court to its conclusion that summary judgment was appropriate. We, however, are convinced that the district court's conclusions were correct. Therefore, we affirm.

### I.

On July 21, 1986, Florence L. Barbetta and James D. Barbetta filed suit in the United States District Court for the Eastern District of Louisiana against the S.S. Bermuda Star ("the Star"), the Star's owner ("Billinghurst"), and the company which chartered and operated the Star from January 25, 1986 until January 31, 1986 ("Baha-

\* Circuit Judge of the Second Circuit, sitting by designation.

ma Cruise"). In their complaint, the Barbettas alleged that they were ticketed passengers on the Star during a cruise which departed from New Orleans, Louisiana on January 25 and sailed to Key West, Florida, Cozumel, Mexico, and Playa del Carmen, Mexico. Shortly after the cruise began, however, Mrs. Barbetta began to feel ill. On January 26, she consulted the ship's doctor ("the doctor") who treated her until January 31. During the five-day period in which the doctor attended her, the Barbettas alleged, Mrs. Barbetta's condition deteriorated—she developed a severe case of pneumonia, lapsed into a coma, and finally had to be removed from the ship and taken to West Jefferson Hospital for treatment. Both the pneumonia and coma, the Barbettas claimed, were caused by the doctor's failure to properly treat Mrs. Barbetta; unbeknownst to Mrs. Barbetta, the Barbettas alleged, at the time Mrs. Barbetta first sought treatment from the doctor, she was suffering from diabetes—a condition which the doctor never diagnosed. Because of the doctor's "malpractice, neglect, carelessness, and negligence" in treating Mrs. Barbetta, the Barbettas continued, Mrs. Barbetta incurred damages of $700,000 (including medical treatment, pain and suffering, and lost wages) and Mr. Barbetta incurred damages of $300,000 (including loss of consortium and loss of service, society, and support). Defendants were responsible for these damages, the Barbettas concluded, because they failed to assure that the Star was properly staffed with competent medical personnel. In addition, the Barbettas argued, the doctor's negligence was committed during the course and scope of his employment with Bahama Cruise; therefore, Bahama Cruise was also vicariously liable for the doctor's negligence under the doctrine of respondeat superior.

On October 21, Bahama Cruise and Billinghurst ("defendants") answered the Barbettas' complaint by denying liability and asserting several affirmative defenses. Four months later, defendants filed their motion for summary judgment. In it, defendants argued that under general maritime principles, defendants could not be held liable for the alleged malpractice of the shipboard physician. In addition, defendants argued that by purchasing their cruise tickets, the Barbettas entered into a ticket contract with defendants which was controlled by the terms set out in the ticket. One of those terms, defendants pointed out, specifically noted that any physician provided by defendants was

> solely for the convenience of the Passenger and services rendered by [the physician] to the Passenger are at the latter's expense. Any such person in dealing with, giving service to, treating or operating upon a Passenger is not the servant or agent of the Carrier, and the Carrier shall not be liable for any omission, negligence or damage done by such person.

Because of this contractual disclaimer—which, defendants argued, is "entirely consistent with general maritime principles"—defendants could not be held responsible for the doctor's negligence. Defendants attached to their motion for summary judgment the affidavit of Julio Del Valle, the president of Bahama Cruise, who confirmed that the doctor was employed as an "independent medical expert[ ]" and that he was not a servant or agent of Bahama Cruise. Attached to Del Valle's affidavit were copies of the resume, references, and other documentation which the doctor had provided Bahama Cruise prior to serving as the Star's physician. On March 2, 1987, the Barbettas responded to defendants' motion. In their response, the Barbettas disputed defendants' argument that general principles of maritime law do not support holding the defendants responsible for the doctor's negligence. The Barbettas also denied that the ticket contract disclaimer to which defendants pointed protected defendants from liability—in this particular case, the Barbettas argued, the employment contract between the doctor and Bahama Cruise showed that, despite the ticket's language, the doctor actually was a "servant or agent" of Bahama Cruise; therefore, because the ticket provision indicated to the contrary, that provision never came into play.

On March 11, 1987, the district court held a hearing at which it ruled on defendants' motion. The court began its discussion of the merits of defendants' motion by noting that neither the Supreme Court nor this circuit has spoken on the issue of whether a shipping company is liable under the doctrine of respondeat superior when the ship's doctor negligently treats a passenger. Several district courts in other jurisdictions, however, have examined the issue and have determined that liability will not lie; the court admitted, however, that one court has held otherwise and, therefore, concluded that—when no disclaimer provision is involved—the general maritime law offers no completely consistent answer. But in this case, the court explained, the defendants intended to limit their liability for the doctor's negligence by including the disclaimer provision in the ticket contract. And even though the provision stated that the doctor was not a "servant or agent" of the carrier, the obvious intent of the clause was to limit defendants' liability regardless of whether the doctor was actually, for other purposes, classified as an independent contractor or an employee. Therefore, the court concluded, the only real question was whether the defendants' attempt to contractually limit their liability in this way was against public policy. In a normal, non-admiralty situation, the court conceded, public policy would nullify the clause defendants included. But the admiralty context, the court concluded, is sufficiently different to change the result here. As the court explained:

> [W]hether the doctor is an employee or not, a vessel ought to be able to contract in this context, whereas a typical employer could not because of the unusual nature of the voyage, because of the unusual nature of admiralty, and because I think that it is in the best interest of passengers generally for there to be physicians aboard vessels, and that vessel owners are going to be more likely to have physicians aboard if they can have a contract with the passenger.

Consequently, the court found that defendants' liability could not, in this case, be premised on the doctrine of respondeat superior. The court also pointed out, however, that the defendants had, in their motion, completely ignored the assertion, made in the Barbettas' complaint, that defendants were responsible for the Barbettas' damages because defendants negligently hired an incompetent physician for the Star. The defendants acknowledged that they had not covered the negligent hiring argument in their motion and that summary judgment on that point would be premature; for their part, the Barbettas indicated that they wanted to pursue that issue, although they acknowledged that they had not, to date, done so. Because of the unresolved issue, the district court continued its ruling on the motion for ninety days; according to the court, the continuance was specifically designed to permit the Barbettas time in which to gather evidence to raise a fact issue on the negligent hiring claim. The court and the parties agreed to meet again in June to finally resolve defendants' motion.

On June 18, 1987, the Barbettas filed a new memorandum which addressed the negligent hiring argument. From defendants' responses to interrogatories, the Barbettas had learned the details surrounding the doctor's hiring: they learned that Bahama Cruise asked Pacific Asia Overseas Corporation ("PASCOR") to find a doctor for the Star, that PASCOR provided the doctor who treated Mrs. Barbetta, and that Bahama Cruise hired the doctor after reviewing his qualifications. From defendants' response to a request for document production, the Barbettas learned the doctor's qualifications: prior to being employed by Bahama Cruise, the doctor was licensed and practiced medicine in the Philippines for twenty-three years; during his years of practice, he participated in many continuing education programs, was decorated several times for his performance as a doctor in the Philippines military, and was a member in four different medical societies. As to why Bahama Cruise was negligent in hiring this doctor, the Barbettas argued that Bahama Cruise should have made an independent, diligent inquiry into the doctor's qualifications instead of relying solely on

the information which led PASCOR to recommend the doctor. Because Bahama Cruise failed to conduct its own investigation, it hired a doctor who was not licensed to practice medicine in the United States, who could not diagnose diabetes, and who had no continuing education during the seven years before Bahama Cruise hired him. The Barbettas attached to their memorandum defendants' responses to interrogatories and copies of the doctor's resume and references which Bahama Cruise received from PASCOR prior to hiring him. One day after receiving the Barbettas' new memorandum, the district court ruled.

In a written order, the district court granted defendants' motion for summary judgment. After quickly noting that the issue of respondeat superior liability had already been resolved, the court turned to the Barbettas' claim that defendants were negligent because they employed a physician without proper investigation as to his qualifications. With respect to this claim, the court noted that it had given the Barbettas ninety days in which to develop material facts to support the claim and concluded that, despite the information contained in the Barbettas' latest memorandum, they had failed to do so. As the court explained, "There is nothing in the documentation submitted since the last hearing to create any genuine issue as to a material fact ... to support the contention that the vessel owners were negligent in employing an incompetent physician." Consequently, the court entered judgment in favor of all defendants and dismissed the Barbettas' suit at their cost. From this judgment, the Barbettas appeal; they present challenges to both the district court's findings. Before reaching the individual arguments, we first turn to the standards by which we review the district court's judgment.

## II.

On appeal, we evaluate a district court's decision to grant summary judgment by reviewing the record under the same standards which guided the district court. *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.*, 832

F.2d 1358, 1364 (5th Cir.1987); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). Consequently, we may affirm a summary judgment "only when we are convinced, after an independent review of the record, that 'there is no genuine issue as to any material fact' and that the movant is 'entitled to a judgment as a matter of law.'" *Brooks*, 832 F.2d at 1364 (quoting Fed.R.Civ.P. 56(c)). We decide questions of law under this standard just as we decide questions of law outside the summary judgment context: de novo. *Id.* Our review of fact questions is deferential to the nonmovant; when a fact question controls disposition on summary judgment, we must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid*, 784 F.2d at 578. This deferential review, of course, does not guarantee that whenever a fact question is involved a nonmovant will survive a summary judgment motion. If the evidence which a nonmovant has developed does not, even when viewed deferentially, raise a genuine issue of material fact on an element essential to the nonmovant's case and on which the nonmovant will bear the burden of proof at trial, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Noyola v. Texas Dept. of Human Resources*, 846 F.2d 1021, 1023 (5th Cir.1988). In this case, the Barbettas' claim raises a question of law: Assuming the doctor was negligent in performing his duties, would the doctrine of respondeat superior impose liability on the defendants? The claim also raises a question of fact: Did defendants negligently hire an incompetent doctor? Keeping the standards of review for each in mind, we turn first to the question of law.

In answering the question of respondeat superior liability, the district court first assumed that general maritime law imposes the liability and, because it made the assumption, went on to find both that public policy permits the liability to be disclaimed and that defendants, through the ticket contract, made a successful disclaimer in this case. Instead of looking at the ticket contract, we focus our attention

on the question whose answer the district court assumed: Does general maritime law impose liability, under the doctrine of respondeat superior, upon a carrier or ship owner for the negligence of a ship's doctor who treats the ship's passengers? Although neither the Supreme Court, this court, nor any district court in this circuit has ruled on the question, we are not without guidance. An impressive number of courts from many jurisdictions have, for almost one hundred years, followed the same basic rule: When a carrier undertakes to employ a doctor aboard ship for its passengers' convenience, the carrier has a duty to employ a doctor who is competent and duly qualified. If the carrier breaches its duty, it is responsible for its own negligence. If the doctor is negligent in treating a passenger, however, that negligence will not be imputed to the carrier.[1] *E.g., The Korea Maru,* 254 F. 397, 399 (9th Cir.1918); *The Great Northern,* 251 F. 826, 830–32 (9th Cir.1918); *Di Bonaventure v. Home Lines, Inc.,* 536 F.Supp. 100, 103–04 (E.D. Penn.1982); *Cimini v. Italia Crociere Int'l S.P.A.,* 1981 A.M.C. 2674, 2677 (S.D.N.Y.1981); *Amdur v. Zim Israel Navigation Co.,* 310 F.Supp. 1033, 1042 (S.D.N.Y.1969); *Branch v. Compagnie Generale Transatlantique,* 11 F.Supp. 832 (S.D.N.Y. 1935); *Churchill v. United Fruit Co.,* 294 F. 400, 402 (D. Mass.1923); *The Napolitan Prince,* 134 F. 159, 160 (E.D.N.Y.1904); *O'Brien v. Cunard Steamship Co.,* 154 Mass. 272, 28 N.E. 266, 267 (1891); *Laubheim v. De Koninglyke Neder Landsche Stoomboot Maatschappy,* 107 N.Y. 228, 13 N.E. 781 (1887). *See De Zon v. American President Lines, Ltd.,* 318 U.S. 660, 666–67 n. 2, 63 S.Ct. 814, 817–18 n. 2, 87 L.Ed. 1065 (1943) (tracing the development of the

basic rule in the state courts, and recognizing the influence which those state "judges of great learning, for courts of last resort of states having much to do with maritime pursuits," had on the rule's development in the federal courts); *see also* 1 M. Norris, The Law of Maritime Personal Injuries § 39 (3d ed. 1975).

There are two justifications for the rule. The first justification emphasizes the nature of the relationship between the passenger and the physician, and the carrier's lack of control over that relationship. As the Massachusetts Supreme Court explained in *O'Brien:*

> The work which the physician or surgeon does ... is under the control of the passengers themselves. It is their business, not the business of the carrier.... The master or owners of the ship cannot interfere in the treatment of the medical officer when he attends a passenger. He is not their servant engaged in their business, and subject to their control as to his mode of treatment.

*O'Brien,* 28 N.E. at 267; *accord Churchill,* 294 F. at 401–02; *The Great Northern,* 251 F. at 831. Along with recognizing that the relationship between a ship's doctor and a passenger limits a carrier's ability to control the doctor as he serves the passengers, the courts have also recognized a second restrictive force. As one court explained:

> [A] shipping company is not in the business of providing medical services to passengers; it does not possess the expertise requisite to supervise a physician or surgeon carried on board a ship as a convenience to passengers. A ship is not a floating hospital; a ship's physician is

---

**1.** The rule is distinctly otherwise if the doctor is employed by the ship to treat the ship's seamen. In that case, the seaman is entitled to sue the shipowner under the Jones Act, 46 U.S.C. § 688, for the ship doctor's negligent treatment. *De Zon v. American President Lines, Ltd.,* 318 U.S. 660, 664–69, 63 S.Ct. 814, 817–19, 87 L.Ed. 1065 (1943); *DeCenteno v. Gulf Fleet Crews, Inc.,* 798 F.2d 138, 140 (5th Cir.1986); *Joiner v. Diamond M Drilling Co.,* 688 F.2d 256, 262 n. 9 (5th Cir.1982). This difference in treatment between passengers on the one hand and seamen on the other is justified by the statutorily recognized

special relationship which exists between a seaman and his employer. As the Supreme Court explained:

> When the seaman becomes committed to the service of the ship, the maritime law annexes a duty that no private agreement is competent to abrogate, and the ship is committed to the maintenance and cure of the seaman for illness or injury during the period of the voyage, and in some cases for a period thereafter. This duty does not depend upon fault.

*De Zon,* 318 U.S. at 667, 63 S.Ct. at 818.

an independent medical expert engaged on the basis of his professional qualifications and carried on board a ship for the convenience of passengers, who are free to contract with him for any medical services they may require.

*Amdur,* 310 F.Supp. at 1042; *accord O'Brien,* 28 N.E. at 267 ("The law does not put the business of treating sick passengers into the charge of common carriers, and make them responsible for the proper management of it."). The reason, of course, that both justifications for the general rule are tied to the concept of control is that respondeat superior liability is predicated upon the control inherent in a master-servant relationship. *Di Bonaventure,* 536 F.Supp. at 104. Because it would be inconsistent with the basic theory of respondeat superior liability to impose responsibility vicariously where the "master"—that is, the ship owner or carrier—lacks the ability to meaningfully control the relevant actions of its "servant"—that is, the ship's doctor—these courts have refused to do so.

The Barbettas recognize that by asking us to impute the doctor's negligence, to the extent it exists, onto the defendants, they are asking us to reject a rule of law which courts that have considered the question for the last one hundred years have embraced. The Barbettas point out, however, that our departure from the course which these courts have taken would not be unprecedented. In 1959, a federal district court in California specifically rejected the general rule, and in its place, adopted another:

> It is our opinion that, where a ship's physician is in the regular employment of a ship, as a salaried member of the crew, subject to the ship's discipline and the master's orders, and presumably also under the general direction and supervision of the company's chief surgeon through modern means of communication, he is, for the purposes of respondeat superior at least, in the nature of an employee or servant for whose negligent treatment of a passenger a shipowner may be held liable.

*Nietes v. American President Lines, Ltd.,* 188 F.Supp. 219, 220 (N.D. Cal.1959); *see* 1

M. Norris, The Law of Maritime Personal Injuries § 39 (3d ed. 1975) (approving the *Nietes* court's analysis). The *Nietes* court claimed to have been led to this rule by its conclusion that concerns over a carrier's ability to control or supervise a professionally skilled physician are not a "realistic basis for the determination of liability in our modern, highly organized industrial society." *Nietes,* 188 F.Supp. at 220. As the *Nietes* court saw it, liability is proper despite the carrier's lack of control because "the employment of a doctor aboard ship is a beneficial substitute" for an otherwise more costly duty which the shipowner owes to its passengers—to provide such care and attention as is reasonable and practicable under the circumstances, even if that means changing course and putting in at the nearest port. *Id.* at 221. Advocating the *Nietes* court's position, the Barbettas now ask us to adopt that court's rule and determine whether vicarious liability lies for a doctor's negligence based upon a strict evaluation of the doctor's relationship with the carrier or ship owner: if the doctor is "in the regular employment of the ship," liability will be imputed to the employer; if the doctor is not an employee, liability will not be imputed. For several reasons, we decline to follow the *Nietes* court's lead.

First of all, we find the *Nietes* court's reasoning to be internally contradictory. The court claimed that the carrier's ability to control the doctor should not be considered in determining whether to impose vicarious liability; instead, as the court expressed it, a carrier must be liable for a ship doctor's negligent treatment because the carrier chose to discharge its duty to provide its passengers with reasonable medical care by bringing the doctor aboard the ship. The policy underlying the court's rule, therefore, sounds in strict liability. The rule the *Nietes* court actually adopted, however, imposes liability only when the carrier has some control over the doctor it brought on board: if the carrier pays the doctor's salary, can subject him to discipline, and can give him orders, the carrier is responsible for the doctor's negligence. Despite its words to the contrary, there-

fore, the *Nietes* court did understand that the control inherent in a master-servant relationship is the foundation upon which respondeat superior liability normally rests. Consequently, the difference between those courts that have refused to impose vicarious liability and the *Nietes* court is that the *Nietes* court apparently believed that the employment relationship between a carrier and a ship's doctor provides the necessary control. We disagree.

We think that the *Nietes* court has confused the employer's right to control its employees' general actions with its ability to control those specific actions which could subject the employer to liability. In the case of a ship's doctor, as we explained above, numerous courts have found that the carrier or ship owner lacks both (1) the expertise to meaningfully evaluate and, therefore, control a doctor's treatment of his patients and (2) the power, even if it had the knowledge, to intrude into the physician-patient relationship. The *Nietes* court's only acknowledgement of this, the true difficulty with imposing liability based upon a theory of control, was its "presumption" that the ship's doctor is always linked, through modern means of communication, to a "chief surgeon" with the power to supervise and the discretion to direct the ship doctor's hand. We think that with this presumption, the *Nietes* court unrealistically presumed away the problem; as the *Amdur* court explained when commenting on *Nietes:*

> It is pure sophistry to assert that a ship's master is capable of "supervising" the medical treatment rendered by a physician, or that some shore-based "company chief surgeon," by his very existence, is capable of supervising or controlling the actions of a ship's physician. A shore-bound chief surgeon may indeed be capable of setting forth general medical procedures of engaging the services of competent physicians, and of prescribing the contents of the ship's medical chest; but he does not occupy a position of control over a ship's physician sufficiently immediate to warrant equation with the hospital-doctor standard. To pretend, as the *Nietes* case does, that mere employment

of a physician by a shipping company ... creates control, is to create a species of liability without fault which is without precedent.

*Amdur,* 310 F.Supp. at 1042–43; *accord Di Bonaventure,* 536 F.Supp. at 103–04. We agree with those courts which have concluded that if the carrier's ability to control the doctor's treatment is a necessary prerequisite to imposing liability, liability cannot—as the *Nietes* court would have it— turn on whether the doctor is technically an employee or an independent contractor. Moreover, we also agree with those same courts that in reality, a carrier cannot exercise control over the ship's doctor as he practices medicine; if control is a prerequisite to respondeat superior liability, therefore, the general rule against holding the carrier or ship owner vicariously liable for the doctor's negligence must prevail. The only remaining question is whether control is, as all these courts have found, a necessary prerequisite. The only argument to the contrary was espoused by the *Nietes* court: that a carrier employs a doctor as an economically efficient way of discharging a duty to its passengers which could and, if the doctor is negligent, should be more costly; if the carrier is to benefit from the doctor's presence, the argument goes, it should also bear the costs associated with its choice.

We agree that although a carrier has no duty to furnish a doctor for its passengers' use, it does owe its sick and injured passengers a duty to exercise "reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances." 1 M. Norris, The Law of Maritime Personal Injuries § 39 (3d ed. 1975). But we do not agree with the *Nietes* court's assumption that by hiring any doctor to sail with the vessel, the carrier discharges that duty. First of all, the cases uniformly hold that a carrier, when hiring a doctor for its passengers' convenience, must choose a doctor who is competent and duly qualified. To the extent that a carrier negligently hires an incompetent doctor, therefore, the carrier has not discharged its duty to its sick

and injured passengers. Second, as the Barbettas' counsel acknowledged during oral argument, even though a ship's doctor is provided for the passenger's convenience, no passenger is required to use the doctor's services; consequently, as counsel also conceded, a carrier must honor a passenger's decision not to use the ship's doctor and, when necessary, discharge its duty to provide aid in some other way. Given that the *Nietes* court wrongly assumed that without respondeat superior liability, a carrier could escape legal responsibility simply by providing any doctor for its passengers, we reject that court's analysis of why vicarious liability is necessary. Instead, we hold—as has every court to consider the question in the last one hundred years except the *Nietes* court—that general maritime law does not impose liability under the doctrine of respondeat superior upon a carrier or ship owner for the negligence of a ship's doctor who treats the ship's passengers.[2] We turn, therefore, to the remaining issue on appeal: Did the district court err in concluding that the Barbettas failed to raise, through summary judgment evidence, a fact issue as to whether defendants negligently hired the doctor?

The summary judgment evidence filed by both parties showed that Bahama Cruise hired the doctor after PASCOR recommended him for employment. The doctor had obtained a doctor of medicine degree from the Universitas Sancti Thomae in the Philippines in 1962, and became certified to practice medicine in the Philippines after passing his Medical Boards Examination Test. While a practicing physician, the doctor attended six different post-graduate seminars on a variety of medical topics. He worked in Manila as company physician for BF Goodrich Corp. from 1963 to 1964,

served as a medical officer in the armed forces of the Philippines from 1965 to 1976, worked as part of the medical staff for the United States' VA clinic in Manila from 1976 to 1983, worked in Japan as company physician for Kubota Construction Co. from 1983 to 1984, and was assistant chief of hospital staff at Medicare Community Hospital and Health Center in General Tinio from 1984 until he was hired by Bahama Cruise in 1985. For his performance during his service with the Philippines' military, the doctor was twice decorated; for his performance during his employment with the VA clinic in Manila, the doctor received several letters of recommendation from his superiors.

The Barbettas deduce from this evidence two pieces of information which, they maintain, raise a jury question about whether Bahama Cruise negligently hired an incompetent doctor. The first piece of information is that while he served as physician aboard the Star, the doctor apparently was not qualified to practice medicine within the United States; this information is important, the Barbettas maintain, because when a carrier hires a doctor who cannot practice medicine in the United States, it commits "actionable negligence." The Barbettas' only support for this proposition comes from Title 8 to the United States Code, which lists among those classes of aliens which "shall be ineligible to receive visas and shall be excluded from admission into the United States:"

> [a]liens who are graduates of a medical school not accredited by a body or bodies approved for the purpose by the Secretary of Education (regardless of whether such school of medicine is in the United States) and are coming to the United States principally to perform services as

---

**2.** Because we conclude that the law does not impose respondeat superior liability upon a carrier or ship owner for the negligence of its doctor, we do not reach the question of whether, if the law did impose liability, the contractual provision on which the district court focused validly removed it. *See* 46 U.S.C.App. § 183c (prohibiting vessels transporting passengers from disclaiming liability for the negligence of its servants which causes death or bodily injury); *see also Kornberg v. Carnival Cruise Lines,*

*Inc.,* 741 F.2d 1332, 1335–36 (11th Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985) ("46 U.S.C. [App.] § 183c expressly invalidates any contract provision purporting to limit a ship's liability for negligence to its passengers."). We note only that because there was no liability to disclaim, the contractual provision is not a disclaimer; it is, instead, merely an accurate restatement of the principles of general maritime law which we have reviewed above.

members of the medical profession, except such aliens who have passed parts I and II of the National Board of Medical Examiners Examination (or an equivalent examination as determined by the Secretary of Health and Human Services) and who are competent in oral and written English.

8 U.S.C. § 1182(a)(32). For several reasons, we cannot agree that on this point the Barbettas have raised a genuine issue of material fact. First, the law which the Barbettas cite does not support the argument for which the Barbettas cite it. Section 1182 of Title 8 obviously does not seek to control the qualifications of doctors who serve aboard passenger ships; it merely determines those aliens to whom visas, and, therefore, admission into the United States may not be granted. In this case, of course, we are not concerned with whether the doctor should be granted admission into the United States to practice medicine. Second, we have found neither case support nor statutory support for the Barbettas' argument that a passenger ship which serves—among others—American passengers must, if it employs a doctor, employ one who is qualified to practice medicine in the United States.

▮ Given the lack of support for their position, the Barbettas are really asking us to do two things: (1) hold, for the first time and as a matter of public policy, that alien doctors who meet the qualifications for admission to practice medicine in the United States are the only doctors who are obviously competent to treat American passengers aboard ship and, therefore, that (2) if a ship elects to hire an alien doctor who, although qualified to practice elsewhere, has not gained admittance to practice in the United States, the doctor's competency and the ship's negligence in hiring

that doctor are automatically in issue. We see no reason to do either, especially in this situation. The Barbettas point to nothing about the Philippines' system of qualifying doctors which suggests that the doctor's education should have caused defendants to question the doctor's competency. They point to nothing in the doctor's record which suggests that the doctor's work experience should have caused defendants to question the doctor's competency. In the face of these undisputed credentials which show that the doctor practiced medicine in the Philippines for over twenty years, we are unwilling to say that a fact question on either the doctor's competence or Bahama Cruise's negligence arises simply because the doctor apparently did not obtain admission into the United States to practice medicine.

We think the fact that the Barbettas have not disputed the doctor's record qualifications also explains why the second piece of information the Barbettas point to is insufficient to create a fact question. The Barbettas argue that it may have been negligent for Bahama Cruise to decide to hire the doctor based solely on PASCOR's recommendation and the qualifications which PASCOR provided Bahama Cruise. The Barbettas do not, however, indicate that if Bahama Cruise had conducted its own, independent investigation into the doctor's background, they would have discovered any information—apart from the fact that the doctor could not have practiced in the United States—which should have suggested to Bahama Cruise that the doctor was incompetent.[3] It is, we think, axiomatic that a plaintiff cannot defeat a motion for summary judgment simply by asserting that undiscovered information might exist somewhere which would create a genuine issue of material fact on an

---

**3.** The Barbettas half-heartedly argue that the doctor's alleged failure to diagnose Mrs. Barbetta's diabetes somehow proves that Bahama Cruise must have been negligent—apparently, the Barbettas are asserting that it is negligence per se to hire a doctor who cannot diagnose a condition, as the Barbettas characterize it, as "common" as diabetes. Besides creating a logical quandry—can we say that a misdiagnosis made after the doctor began work should have

alerted Bahama Cruise not to hire the doctor in the first place?—the point is well settled. The courts have consistently held, and we agree, that "[t]he fact that the physician errs in his treatment does not prove that he was incompetent or that the company was negligent in appointing him." *Amdur,* 310 F.Supp. at 1042 (citing cases); *accord Di Bonaventure,* 536 F.Supp. at 103.

element of the plaintiff's claim. *See Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. In this case, the Barbettas were given ample time for discovery and, as the district court found, simply produced no evidence to suggest either that the doctor was incompetent or that Bahama Cruise was negligent when it hired the doctor. In addition to correctly granting summary judgment on the issue of respondeat superior liability, therefore, the district court also correctly dismissed the Barbettas' negligent hiring claim.

### III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.